**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

JAMES HALAMEK, KARL TYSL, and KATHY WOODS, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

PHILIPS NORTH AMERICA LLC, THE ERISA INVESTMENT COMMITTEE OF PHILIPS NORTH AMERICA LLC, and JOHN DOES 1-10,

Defendants.

**NO.: 1:25-cv-12003-FDS**

**AMENDED CLASS ACTION COMPLAINT**[1]

Plaintiffs, James Halamek, Karl Tysl, and Kathy Woods ("Plaintiffs"), by and through their attorneys, on behalf of the Philips North America 401(k) Plan (the "Plan"),[2] themselves and all others similarly situated, state and allege as follows:

## I. INTRODUCTION

1. This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Philips North America LLC ("Philips" or "Company"), and the ERISA Committee of Philips North America LLC and its members during the Class Period (the "Committee").

2. The Plan is a defined contribution plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred

---

[1] Plaintiffs file this Amended Class Action Complaint pursuant to FED. R. CIV. P. 15(a)(1)(B).

[2] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

contributions from their salaries to the Plan. *See* Independent Auditor's Report ("Auditor's Report"), attached to 2023 Form 5500 for the Plan, at 7 ("It is a defined contribution Plan with a pre-tax 401(k) component under which salaried and hourly employees of Philips North America LLC … may participate as soon as administratively possible after their date of hire …").

3. To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Moitoso v. FMR LLC*, 2020 WL 1495938, at * 6 (D. Mass. Mar. 27, 2020) (quoting *Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009).

4. The Department of Labor ("DOL") has also explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers."[3]; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

5. Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

6. "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but

[3] *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited July 24, 2024).

also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[4]

7. The Supreme Court reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 741 (2022).

8. Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, failing to objectively and adequately review the Plan's investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance.

9. At all times during the Class Period, the Plan had at least $4 billion dollars in assets under management. At the Plan's fiscal year end in 2019, the Plan had $4,898,009,752 in assets under management that were/are entrusted to the care of the Plan's fiduciaries. *See* 2019 Form 5500 for the Plan, Schedule H, at 2.

10. By 2023, the Plan had $5,779,286,156 in assets under management. *See* 2023 Form 5500 for the Plan, Schedule H, at 2.

11. The Plan's assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States. In 2021, only 0.2

---

[4] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

percent (1,011 of 641,747) of plans in the country had more than $1 billion in assets under management.[5] In addition, this was true at the start of the Class Period in 2019 where only 0.1 percent (776 of 603,217) of 401(k) plans in the country were as large as the Plan.[6]

12. The Plan is also large in terms of the number of its participants. At the beginning of the Class Period, the Plan had 28,428 participants. *See* 2019 Form 5500 for the Plan, at 2. By 2023, the Plan had 29,489 participants. *See* 2023 Form 5500 for the Plan, at 2.

13. With regard to the Plan's investments, Defendants breached their fiduciary duty of prudence by selecting and/or maintaining a certain stable-value investment with lower crediting rates when compared to available similar investments with higher crediting rates. The crediting rate is the guaranteed rate of return for the investment fund.

14. Specifically, Defendants allowed substantial assets in the Plan to be invested in the Prudential Stable Value Fund ("Prudential SVF"), a Guaranteed Income Fund. The Prudential SVF carried significantly more risk and provided a significantly lower rate of return than other comparable stable value funds that Defendants could have made available to Plan participants.

15. A prudent fiduciary would not have included this underperforming investment option that also carried significantly more risk than other investment options that had similar goals, *i.e.,* preservation of investment assets.

16. Plaintiffs also allege that Defendants breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by failing to "defray[] reasonable expenses of administering the [Plan]." 29 U.S.C. § 1104(a)(A)(ii). Their failure stems from the use of Plan participant forfeited funds to reduce employer contributions to the Plan instead of using the funds

---

[5] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2021 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2024-08/24-ppr-dcplan-profile-401k.pdf.

[6] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2019 at Ex. 1.2, p. 7, available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.

to reduce or eliminate the amounts charged to Plan participants for Plan administrative costs. This action by the Defendants was a clear breach of the duties of prudence and loyalty to Plan participants and cost Plan participants millions of dollars.

17. During the putative Class Period, Defendants, as a "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*: (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost and performance; and (2) failing to defray reasonable expenses of administering the Plan.

18. Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

19. Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count I), failure to monitor fiduciaries (Count II), and breach of the fiduciary duty of loyalty (Count III).

## II. JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

21. This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

22. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III. PARTIES

**Plaintiffs**

23. Plaintiff, James Halamek ("Halamek"), resides in Independence, Ohio. During his employment, Plaintiff Halamek participated in the Plan. Mr. Halamek invested in the Prudential SVF in the Plan and suffered injury to his Plan account due to the significant underperformance of the Prudential SVF. Plaintiff Halamek also suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay Plan administrative expenses which, if used to pay for administrative expenses, would have reduced or eliminated the amounts charged to Plaintiff Halamek's individual account.

24. Plaintiff, Karl Tysl ("Tysl"), resides in Chardon, Ohio. During his employment, Plaintiff Tysl participated in the Plan. Mr. Tysl invested in the Prudential SVF in the Plan and suffered injury to his Plan account due to the significant underperformance of the Prudential SVF. Plaintiff Tysl also suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay Plan administrative expenses which, if used to pay for administrative expenses, would have reduced or eliminated the amounts charged to Plaintiff Tysl's individual account.

25. Plaintiff, Kathy Woods ("Woods"), resides in Memphis, Tennessee. During her employment, Plaintiff Woods participated in the Plan. Ms. Woods invested in the Prudential SVF in the Plan and suffered injury to her Plan account due to the significant underperformance of the Prudential SVF. Plaintiff Woods also suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay Plan administrative expenses which, if used to pay for administrative

expenses, would have reduced or eliminated the amounts charged to Plaintiff Woods's individual account.

26. Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their account currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

27. Plaintiffs did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

28. Philips North America LLC is the Plan sponsor and Plan administrator with a principal place of business at 222 Jacobs Street, Cambridge Massachusetts. *See* 2023 Form 5500 of the Plan, at 1; *see also* 2023 Form 5500 of the Plan, at 2 ("Plan administrator's name and address … Same as Plan Sponsor."). "Philips North America LLC, doing business as Philips Healthcare, is a subsidiary of Koninklijke Philips Electronic N.V., a global leader in health technology."[7] "Koninklijke Philips NV (Philips) is a diversified technology company that develops and manufactures medical systems and consumer electronics products. The company offers products in the areas of precision diagnosis, image-guided therapy, monitoring, enterprise informatics, sleep and respiratory care, and personal health."[8]

---

[7] *See* https://govtribe.com/vendors/philips-electronics-north-america-corporation-philips-healthcare-a-division-of-penac-0zbj4, last accessed on June 17, 2025.

[8] *See* https://www.globaldata.com/company-profile/koninklijke-philips-nv/, last accessed on June 17, 2025.

29. During the putative Class Period, the Company is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because it had control over Plan management and/or authority or control over management or disposition of Plan assets.

30. "The ERISA Investment Committee of the Company or its appointed investment advisors periodically review the investment results of current investment options and evaluate new investments that may be suitable for the Plan." Auditor's Report, attached to 2023 Form 5500 for the Plan, at 9.

31. Philips appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers and that the Plan paid a fair price for recordkeeping and administrative services. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

32. Accordingly, Philips during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

33. For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Committee Defendants**

34. As discussed above, Philips appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers.

35. The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

36. The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Committee Defendants."

## IV. CLASS ACTION ALLEGATIONS [9]

37. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[10]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Philips North America 401(k) Plan, at any time between July 15, 2019 through the date of judgment (the "Class Period").

38. The members of the Class are so numerous that joinder of all members is impractical. The 2023 Form 5500 lists 29,489 Plan "participants with account balances as of the end of the plan year." 2023 Form 5500 for the Plan, at 2.

39. Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all

---

[9] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiff to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[10] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

40. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A. Whether Defendants are/were fiduciaries of the Plan;

B. Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

C. Whether the Company failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D. The proper form of equitable and injunctive relief; and

E. The proper measure of monetary relief.

41. Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

42. This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of

other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

43. In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V. THE PLAN

44. The Plan is a defined contribution plan covering substantially all eligible employees of Philips. *See* Auditor's Report, attached to 2023 Form 5500 for the Plan, at 7. ("It is a defined contribution Plan with a pre-tax 401(k) component under which salaried and hourly employees of Philips North America LLC … and its divisions, subsidiaries, and certain affiliates may participate as soon as administratively possible after their date of hire.").

45. Included in the Plan's available funds was "the Prudential Stable Value Fund, a guaranteed income fund, which is stated at contract value." Auditor's Report, attached to 2023 Form 5500 for the Plan, at 10.

46. At the end of 2019, $284,611,942 in Plan assets were invested in the Prudential SVF. *See* Auditor's Report, attached to 2019 Form 5500 for the Plan, at 13.

47. By the end of 2023, over $423,678,041 in Plan assets were invested in the Prudential SVF. *See* Auditor's Report, attached to 2019 Form 5500 for the Plan, at 17.

48. The chart below demonstrates the amount of Plan assets invested in the Prudential SVF during the Class Period.

| Plan Year | Plan Assets in Prudential SVF |
|---|---|
| 2019 | $284,611,942 |
| 2020 | $405,740,267 |
| 2021 | $420,619,441 |

| | |
|---|---|
| 2022 | $477,861,316 |
| 2023 | $423,678,041 |

***Eligibility***

49. In general, the Plan covers all employees of Philips. *See* Auditor's Report, attached to 2023 Form 5500 for the Plan, at 7. ("[S]alaried and hourly employees of Philips North America LLC … and its divisions, subsidiaries, and certain affiliates may participate as soon as administratively possible after their date of hire (if regularly scheduled to work at least 1,000 hours per year).").

***Contributions***

50. Eligible employees may elect to make contributions to their Plan accounts. *See* SPD, at 4 ("Participants may make a combination of pre-tax, Roth after-tax, and after-tax contributions, in whole percentages of annual eligible compensation through payroll deductions. Participants may contribute up to 75% of their annual eligible compensation in any combination of pre-tax and after-tax contributions, so long as no more than 6% is after-tax contributions."). Auditor's Report, attached to 2023 Form 5500 for the Plan, at 7.

51. "The Company matches 150% of each dollar contributed on the first 4% of participant's annual eligible compensation, as defined, contributed as pre-tax and/or Roth after-tax contributions and 50% on the next 2% of annual earnings contributed as pre-tax and/or Roth after-tax contributions." Auditor's Report, attached to 2023 Form 5500 for the Plan, at 8.

52. Like other companies that sponsor 401(k) plans for their employees, Philips enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https:/www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

53. Philips also benefits in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

54. Given the size of the Plan, Philips likely enjoyed significant tax and cost savings from offering a match.

***Vesting***

55. "Participants are 100% vested in their contributions. Company contributions and earnings thereon become 50% vested after 1 year of service and 100% vested after 2 years of service or when the employee attains age 65, retires, dies or becomes disabled (for 6 months), if earlier." Auditor's Report, attached to 2023 Form 5500 for the Plan, at 8.

***Forfeitures***

56. Forfeitures in a 401(k) plan are the non-vested portion of the employer's contribution to a participant's account balance in the plan. A participant's non-vested portion of their account balance when the employee's employment terminates will become a forfeiture.

57. Defendants had a choice on how to utilize forfeited amounts. At the discretion of Defendants in their fiduciary capacity, forfeitures may be used to either pay the Plan's expenses or reduce the Company's contributions to the Plan. *See* 2023 Form 5500 for the Plan, at 8 ("Under the Plan, these [forfeiture] accounts can be used to reduce future Company contributions or pay administrative expenses of the Plan.").

## VI. THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANTS FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER

### A. ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology of Evaluating Investments

58. As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

59. ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

60. As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

61. The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[11]

62. Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

---

[11] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

63. A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

64. With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

65. The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

66. Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

67. It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S. Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

68. To the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

69. Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes

(and execution of such) for selecting, monitoring, and removing the Plan's investments because this information is solely within the possession of Defendant prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

70. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon several factors.

71. Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the Prudential SVF in the Plan throughout the Class Period that wasted the assets of the Plan and the assets of participants because of unnecessary costs and underperformance.

### B. Defendants Breached Their Fiduciary Duties by Causing the Plan to Offer the Prudential SVF

#### 1. Overview of GICs

72. For defined-contribution retirement plans, stable value investments are intended to provide participants with an option that protects their assets and is shielded from risks of loss, hence why they are called Guaranteed Investment Contracts or GICs.

73. GICs are issued by insurance companies in the form of a fixed annuity contract. Pursuant to the terms of those contracts, the GICs provide for a guaranteed rate of return or "crediting rate" during a specified period.

#### 2. The Plan's Inclusion of the Prudential SVF

74. At all relevant times, Defendants maintained the authority to exercise control over the Plan's investments, including the Plan's Prudential SVF.

75. Although it is referred to as a synthetic GIC (*see* 2023 Form 5500, Schedule A, at 3), the Prudential SVF is structured and operates as a traditional GIC. That is because the Prudential SVF is a separate account GIC with one wrap provider.

76. The Form 5500s Auditor's Report state as follows:

> The Plan has a ***fully benefit-responsive investment contract*** and therefore, contract value is the relevant measurement for the portion of the net assets available for plan benefits attributable to this investment. Contract value represents contributions made under the contract, plus earnings, less participant withdrawals and administrative expenses. The crediting interest rate is set by Empower Annuity Insurance Company, with a minimum guaranteed rate of 0% annually. The crediting interest rate ranged from 2.69% to 2.80% during the year ended December 31, 2023. ***The crediting rate is declared in advance, is reset semi-annually*** and is net of fund management fees. Daily liquidity is available for participant contributions and withdrawals at contract value regardless of market conditions. Contract value is guaranteed by the full faith and credit of Empower Annuity Insurance Company of America.
>
> ***Certain events may limit the ability of the Plan to transact at contract value***. Such events include termination of the contract, spin-offs, divestitures, layoffs, corporate relocation, partial or total plan termination, retirement incentive programs, and liberalization of plan withdrawal or transfer rules. Upon occurrence of any of these events, a market value adjustment or other withdrawal restrictions may apply. Withdrawals from the Stable Value Fund prompted by the Plan or the Company, such as withdrawals resulting from adjustments to the Plan's investment options, may be paid at less than full contract value. ***The Plan administrator does not believe that the occurrence of any such events is probable***.

Auditor's Reports, attached to Form 5500s for the Plan (emphasis added).

77. For these reasons, the Prudential SVF's crediting rates can be compared to traditional GICs, commingled trust funds also called collective investment trusts, fixed annuity contracts, and other stable value funds or GICs whose terms are: (1) fully benefit-responsive, (2) whose rates are reviewed regularly, and (3) whose contracts are with creditworthy insurance carriers. The Prudential SVF's crediting rates can be also compared to GICs in plans whose managers do not believe that there are any events that are likely to limit the ability of the plan to

transact at the contract value like the Prudential SVF, therein making risk considerations equivalent. The Comparator GICs below meet these requirements.

78. Defendants' selection of the imprudent Prudential SVF was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

### 3. Prudential is at a Substantial Risk of Going Insolvent

#### a. The Securities and Exchange Commission Has Warned that Ratings from Credit Rating Agencies Are Unreliable

79. Because a guaranteed insurance account product is backed by the full faith and credit of the insurer, a focus must be placed on the creditworthiness of the insurer. It used to be the belief that an insurer's financial strength could be determined in part from its ratings from the four major rating agencies. This is no longer the case.

80. A June 7, 2023 Securities and Exchange statement declared that ratings issued by ratings agencies are not reliable. It said these agencies shared blame for the 2008 financial crises:

> These entities' ratings were key to the marketing and sales of mortgage-backed securities, relied on by investors to make informed investment decisions — flaws and conflicts of interest notwithstanding. In some instances, Federal regulations required the use of credit ratings. As the 2011 report noted, the markets' — and, at times the federal government's — reliance on credit ratings that turned out to be highly misleading had consequences that reverberated "throughout the financial system." And not in a good way. …The Commission is replacing the references to credit ratings in Rules 101 and 102 of Regulation M with an alternative standard of creditworthiness that relies on credit risk models.

*See* https://www.sec.gov/newsroom/speeches-statements/lizarraga-statement-credit-ratings-060723

81. The SEC's reference to reliable credit risk models is instructive. It is widely recognized that the two greatest risks faced by for-profit life insurance and annuity ("L&A") carriers are: (1) Higher Risk Offshore Reinsurance and (2) Higher-Risk, Less-Liquid and Investment Concentrations. *See generally*, September 13, 2022 Letter Submitted by Thomas D.

Gober, Insurance and Reinsurance Fraud Expert, to The Hon. Sherrod C. Brown, Chairman Committee on Banking, Housing, and Urban Affairs, at p. 57-68 (available at https://www.congress.gov/117/chrg/CHRG-117shrg53607/CHRG-117shrg53607.pdf)[12]

82. These two higher-risk categories should always be compared against the L&A carrier's surplus, not total assets. This credit risk model enables the reader (or Plan fiduciary) to better assess the degree to which those higher risks can be a real threat to the long-term viability of the L&A carrier.

**b. Recent Lawsuits Have Highlighted Prudential's Extreme Risk of Going Insolvent**

83. Available surplus is the most relevant criteria for measuring insurance company credit worthiness for a number of reasons, the most pertinent of which is that surplus is the only buffer between a viable insurer and an insolvent one. In other words, if an asset must be written down, the total write-down comes out of surplus. That is why it is imprudent to have a thin surplus buffer relative to the carrier's risk profile.

84. A recently filed lawsuit explained that a "cursory review of [Prudential's] statutory filings reveals a shocking dependence on affiliated party transactions with wholly owned affiliates and captive reinsurers and affiliates in Bermuda." *See Dempsey et al. v. Verizon Communications Inc. et al.*, No. 1:24-cv-10004-AKH (S.D.N.Y. Dec. 30, 2024) at ¶ 53.

85. The lawsuit further explained, among other things, that Prudential's surplus of $16 billion as of the end of 2023 paled in comparison to the alleged potential liabilities of $72.8 billion in affiliated party reinsurance and modified co-insurance ("Modco"). *Id.* at ¶¶ 53-54. In other words, given the meager surplus compared to the potential liabilities put Prudential at an extreme risk of insolvency.

[12] The letter to The Hon. Sherrod C. Brown is found within "Current Issues in Insurance, Hearing Before the Committee on Banking, Housing, and Urban Affairs United States Senate, September 8, 2022, available at https://www.govinfo.gov/

### c. Empower's takeover of Prudential Did Not Alleviate the Severe Risk of Insolvency

86. "On April 1, 2022, [Empower Annuity Insurance Company of America] completed the acquisition of all the voting equity interests in Prudential Retirement Insurance and Annuity Company, and subsequently renamed the entity to Empower Annuity Insurance Company, as part of the acquisition of …Prudential's Full Service retirement business." Annual Statement for the Year 2024 of Empower Annuity Insurance Company of America, Notes to Financial Statements.

87. As noted above, available surplus is an important data point in determining an L&A carrier's insolvency risk. Based on its insufficient surplus, Prudential/Empower was/is at severe risk of insolvency.

88. To begin, an important surplus adequacy benchmark ratio is the Surplus to Liabilities (S/L) Ratio. The higher the ratio, the better. The national average for the L&A industry is roughly 7.5%. That average of 7.5% is significantly pulled down by some of the larger, aggressive private equity-controlled carriers with much lower ratios. During the Class Period, Empower (and before it, Prudential), had an alarmingly low S/L ratio. For example, as of 2024, Empower's S/L ratio was less than 1%:

ANNUAL STATEMENT FOR THE YEAR 2024 OF THE Empower Annuity Insurance Company

**LIABILITIES, SURPLUS AND OTHER FUNDS**

| | | 1<br>Current Year | 2<br>Prior Year |
|---|---|---|---|
| 28. | Total liabilities (Lines 26 and 27) | 106,414,669,390 | 91,068,627,605 |
| 29. | Common capital stock | 2,500,000 | 2,500,000 |
| 30. | Preferred capital stock | | |
| 31. | Aggregate write-ins for other-than-special surplus funds | 0 | 0 |
| 32. | Surplus notes | 0 | |
| 33. | Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) | 943,498,537 | 943,498,537 |
| 34. | Aggregate write-ins for special surplus funds | 42,704,077 | 15,222,689 |
| 35. | Unassigned funds (surplus) | 29,697,164 | (24,056,237) |
| 36. | Less treasury stock, at cost: | | |
| | 36.1 ........ shares common (value included in Line 29 $ ........ ) | | |
| | 36.2 ........ shares preferred (value included in Line 30 $ ........ ) | | |
| 37. | Surplus (Total Lines 31+32+33+34+35-36) (including $ ........ in Separate Accounts Statement) | 1,015,899,778 | 934,664,989 |
| 38. | Totals of Lines 29, 30 and 37 (Page 4, Line 55) | 1,018,399,778 | 937,164,989 |
| 39. | Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) | 107,433,069,168 | 92,005,792,594 |

Total Surplus: $ 1,018,399,778 EAIC's 2024 Surplus to Liabilities
Total Liabilities: $ 106,414,669,390 Ratio is Less Than 1%. The
**Surplus to Liabs Ratio:** **0.96%** National Average is About **7.5%**.

89. There are numerous L&A carriers that have substantially higher S/L ratios than Empower. For example, New York Life, at December 31, 2024, had (see below) $26.43 billion in surplus and $218.5 billion in liabilities. That yields a S/L ratio of 12.1%:

| | | | |
|---|---|---|---|
| 28. | Total liabilities (Lines 26 and 27) | 218,473,153,964 | 206,607,540,338 |
| 29. | Common capital stock | | |
| 30. | Preferred capital stock | | |
| 31. | Aggregate write-ins for other-than-special surplus funds | | |
| 32. | Surplus notes | 4,233,167,821 | 4,232,366,504 |
| 33. | Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) | | |
| 34. | Aggregate write-ins for special surplus funds | 803,673,430 | 434,820,194 |
| 35. | Unassigned funds (surplus) | 21,390,599,996 | 20,626,889,733 |
| 36. | Less treasury stock, at cost: | | |
| | 36.1 ........ shares common (value included in Line 29 $ ........ ) | | |
| | 36.2 ........ shares preferred (value included in Line 30 $ ........ ) | | |
| 37. | Surplus (Total Lines 31+32+33+34+35-36) (including $ ........ in Separate Accounts Statement) | 26,427,441,247 | 25,294,076,431 |
| 38. | Totals of Lines 29, 30 and 37 (Page 4, Line 55) | 26,427,441,247 | 25,294,076,431 |
| 39. | Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) | 244,900,595,211 | 231,901,616,769 |

| | | | |
|---|---|---|---|
| Total Surplus: | $ | 26,427,441,247 | EAIC's 2024 Surplus to Liabilities |
| Total Liabilities: | $ | 218,473,153,964 | Ratio is Less Than 1%. The |
| **Surplus to Liabs Ratio:** | | **12.10%** | National Average is About **7.5%**. |

### d. Prudential/Empower Is/Was Rendered Vulnerable Because of its Higher Risk, Offshore Reinsurance Compared to its Surplus

90. Specific to this matter, Empower entered into several significant reinsurance transactions with one offshore reinsurer. First, Empower ceded (Schedule S – Part 3 shown below) **$2.64 billion in Reserve Credit** (column 9) to Hannover Life Reassurance Company of America (Bermuda) Ltd (HLRCA Bermuda). The "reserve credit" means that Empower has *deducted* that $2.64 billion from its liabilities because the reinsurer has reportedly *set up* that amount in liabilities on their end. As an offshore reinsurer, HLRCA Bermuda does not report to US regulators under US SAP (Statutory Accounting Principles). This lack of transparency is significant and makes it difficult, most often impossible, to determine how the reinsurer is accounting for the transaction on their end.

ANNUAL STATEMENT FOR THE YEAR 2024 OF THE Empower Annuity In

**SCHEDULE S - PART 3 - SECTION**

Reinsurance Ceded Life Insurance, Annuities, Deposit Funds and Other Liabilities Without Life or Disability Contingencies, and Related Ber

| 1<br>NAIC Company Code | 2<br>ID Number | 3<br>Effective Date | 4<br>Name of Company | 5<br>Domiciliary Jurisdiction | 6<br>Type of Reinsurance Ceded | 7<br>Type of Business Ceded | 8<br>Amount in Force at End of Year | Reserve Cr<br>9<br>Current Year |
|---|---|---|---|---|---|---|---|---|
| 0399999. Total General Account - Authorized U.S. Affiliates | | | | | | | 0 | 0 |
| 0699999. Total General Account - Authorized Non-U.S. Affiliates | | | | | | | 0 | 0 |
| 0799999. Total General Account - Authorized Affiliates | | | | | | | 0 | 0 |
| 65676 | 35-0472300 | 01/01/1998 | Lincoln National Life Insurance Company | IN | CO/I | VA | 0 | 0 |
| 66869 | 31-4156830 | 12/31/2023 | Nationwide Insurance | OH | CO/G | FA | 0 | 161,418 |
| 0899999. General Account - Authorized U.S. Non-Affiliates | | | | | | | 0 | 161,418 |
| 1099999. Total General Account - Authorized Non-Affiliates | | | | | | | 0 | 161,418 |
| 1199999. Total General Account Authorized | | | | | | | 0 | 161,418 |
| 1499999. Total General Account - Unauthorized U.S. Affiliates | | | | | | | 0 | 0 |
| 1799999. Total General Account - Unauthorized Non-U.S. Affiliates | | | | | | | 0 | 0 |
| 1899999. Total General Account - Unauthorized Affiliates | | | | | | | 0 | 0 |
| 2199999. Total General Account - Unauthorized Non-Affiliates | | | | | | | 0 | 0 |
| 2299999. Total General Account Unauthorized | | | | | | | 0 | 0 |
| 2599999. Total General Account - Certified U.S. Affiliates | | | | | | | 0 | 0 |
| 2899999. Total General Account - Certified Non-U.S. Affiliates | | | | | | | 0 | 0 |
| 2999999. Total General Account - Certified Affiliates | | | | | | | 0 | 0 |
| 00000 | AA-3191255 | 12/31/2022 | Hannover Life Reassur Co. of Amer (Bermuda) LTD | BMU | COFW/G | FA | 0 | 2,638,835,092 |

91. Separate and in addition to the reserve credit reported above, Empower has also entered into a ModCo reinsurance contract with HLRCA Bermuda. Note below, in column 14, that ModCo reinsurance balance was **$25.4 billion**:

ANNUAL STATEMENT FOR THE YEAR 2024 OF THE Empower Annuity Insurance Company

**SCHEDULE S - PART 3 - SECTION 1**

Reinsurance Ceded Life Insurance, Annuities, Deposit Funds and Other Liabilities Without Life or Disability Contingencies, and Related Benefits Listed by Reinsuring Company as of December 31, Current Year

| 1<br>NAIC Company Code | 2<br>ID Number | 3<br>Effective Date | 4<br>Name of Company | 5<br>Domiciliary Jurisdiction | 6<br>Type of Reinsurance Ceded | 7<br>Type of Business Ceded | 8<br>Amount in Force at End of Year | Reserve Credit Taken<br>9<br>Current Year | 10<br>Prior Year | 11<br>Premiums | Outstanding Surplus Relief<br>12<br>Current Year | 13<br>Prior Year | 14<br>Modified Coinsurance Reserve |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 00000 | AA-3191255 | 12/31/2022 | Hannover Life Reassur Co. of Amer (Bermuda) LTD | BMU | MCOFW/G | VA | 0 | 0 | 0 | 0 | 0 | 0 | 25,384,625,880 |

92. The total reported balance of **both offshore contracts is $28 billion**. For perspective, Empower reports total surplus at the same date of **$1.02 billion**:

EAIC Reinsurance Ceded Offshore vs Surplus

At December 31, 2024

**[All data in Billions]**

| Reins Balance | Surplus |
|---|---|
| $ 28.00 | $ 1.02 |



93. The end result of the above maneuvering is that Empower made it appear it had many billions less liabilities than it really had by purportedly off-loading its liabilities to a reinsurer. There is no way to confirm the reinsurer's viability because the reinsurer is off-shore and does not report under statutory accounting in the United States.[13]

94. Moreover, because HLRCA Bermuda does not report in the US in compliance with US statutes, under US SAP, it can't be determined what the "substance" of the transactions are and if HLRCA Bermuda has properly reserved for them. In fact, most technical industry media and numerous federal agencies have warned that the concern with offshore reinsurance, in addition to the lack of transparency, is that a primary motive for going offshore is "regulatory arbitrage,"[14] meaning that the regulatory regime offshore allows less stringent reserving for liabilities, lower capital requirements and less asset quality restrictions. *See* n. 17.

**e. Prudential/Empower Is/Was rendered Vulnerable Because of its Higher Risk, Less-Liquid and Affiliated Investment Concentrations**

95. Empower has a variety of higher-risk assets in significant concentrations relative to its surplus. At December 31, 2024, Empower reported a total of $4.3 billion in higher-risk, less traditional investments that are *not* reported under Long-Term Bonds. These include $3.75 billion

---

[13] *See* "Moody's Waves Yellow Flag as Worries Mount About Reinsurance Deals," by Warren S. Hersch, June 5, 2203 (quoting Moody's Investors Service as stating off-shore reinsurer "business provides less transparency for investors and is generally subject to less regulation than business that resides onshore in U.S.-regulated entity" *See also* "FSOC raises alarm on insurers' use of offshore reinsurance," by Kenneth Araullo, May 10, 2025 (stating "The US Financial Stability Oversight Council (FSOC) has raised concerns about the financial stability of life insurers, citing increasingly complex investment strategies and a growing reliance on offshore reinsurers with less stringent capital requirements."), available at https://www.insurancebusinessmag.com/reinsurance/news/breaking-news/fsoc-raises-alam-on-insuers-use-of-offshore-reinsurance-527931.aspx.

[14] "Regulatory arbitrage is a practice whereby firms capitalize on loopholes in regulatory systems in order to circumvent unfavorable regulations. Arbitrage opportunities may be accomplished by a variety of tactics, including restructuring transactions, financial engineering and geographic relocation to amenable jurisdictions." Investopedia, found at https://www.investopedia.com/terms/r/regulatory-arbitrage.asp

in commercial mortgage loans and $552 million in "Other" invested assets and Derivatives, of which $236.5 million are notably affiliated. Under the Long-Term Bonds category, Empower reports another $3.8 billion in higher-risk, less liquid bond categories, including Residential Mortgage-Backed Securities (MBS), Commercial MBS, "Other Loan-Backed and Structured Securities."

96. The combined total of the above-described investments is $8.1 billion. For perspective, Empower reports total surplus at the same date of **$1.02 billion**:

EAIC Higher-Risk, Less-Liquid Asset Concentrations vs Surplus
At December 31, 2024
**[All data in Billions]**

| H-R Assets | Surplus |
|---|---|
| $ 8.10 | $ 1.02 |




97. Again, the inadequate surplus compared to the investment concentrations puts Empower in dire risk of insolvency, especially in light of the widely reported investment liquidity and valuation stresses today.

***

98. In short, Empower/Prudential's lack of adequate surplus compared to its true liabilities during the Class Period has put Empower/Prudential squarely at risk of insolvency thereby making any "guaranteed" investment contract not worth the paper it is written on.

99. As explained below, there are other reasons why the Prudential SVF was an imprudent investment for the Plan.

### 4. There are Many GICs in the Marketplace with Competitive Crediting Rates

100. The marketplace for GICs is robust with many insurance companies offering GICs with competitive rates.

101. Throughout the Class Period, identical or substantially identical GICs with higher crediting rates were available to the Plan, but were not selected by Defendants.

102. These GICs include:

- The Pomona Valley Hospital Medical Center Retirement Savings Plan's ***fully benefit-responsive synthetic GIC***, where multiple "traditional investment contracts held by the Plan are guaranteed investment contracts" with multiple "contract issuers." *See* Auditor's Report, attached to the 2023 Form 5500 for the Pomona Valley Hospital Medical Center Retirement Savings Plan, at Note E. "The crediting rates are reviewed quarterly." *Id*. Also like the Prudential SVF, "[n]o events are probable of occurring that might limit the ability of the Plan to transact at contract value." *Id*.

- The Baylor College of Medicine Retirement Plan offered a "fully benefit-responsive investment contract." Also like the Prudential SVF, the "[t]he Plan Administrator believes that any events that would limit the Plan's ability to transact at contract value are remote." *See* Auditor's Report, attached to the 2020 Form 5500 for the Baylor College of Medicine Retirement Plan, at Note 5.

- The Gemba Group Annuity Plan ***offered a synthetic GIC*** with multiple underlying "guaranteed investment contracts." Auditor's Report, attached to the 2021 Form 5500 for the Gemba Group Annuity Plan, at Note 4; *see also id*., at Line 4i (listing the insurance companies). Also like the Prudential SVF, "[t]he Plan administrator believes that any events that would limit the Plan's ability to transact at contract value with participants are probable of not occurring." *Id*. The Gemba Group Annuity Plan also has a "guaranteed fixed interest fund" which is also a Synthetic GIC because it has multiple "underlying fully benefit-responsive contracts" and, like the Prudential SVF, "The Plan administrator believes that any events that would limit the Plan's ability to transact at contract value with participants are probable of not occurring." *Id*., at Note 5.

- The Holzer Health System 401(a) Profit Sharing Plan offered a Common collective trust, with multiple "underlying investments (consisting of guaranteed investment contracts, security-backed contracts and common collective trusts)" like the Prudential SVF. Auditor's Report, attached to the 2021 Form 5500 for the Holzer Health System 401(a) Profit Sharing Plan, at Note 3. "[T]he NAV of the fund is

determined daily" and the "[u]nits are issued and redeemed" daily. *Id*. Hence, it was fully benefit-responsive. The assets are listed as assets of the plan. *Id*., at Schedule H. Again, the Prudential SVF's underlying GICs include collective trusts.

- The Jackson National Life Insurance Company Defined Contribution Plan offered a fully benefit-responsive investment contract that was a "Company-sponsored" annuity "exclusively designed for use in connection with the Plan" and is "backed by the creditworthiness of the Company." *See* Auditor's Report, attached to the 2022 Form 5500 for the Jackson National Life Insurance Company Defined Contribution Plan, at Note 3. The Company (Jackson National Life Insurance Company) is the plan sponsor. Also, the crediting rate is "based on current market rates[,]" not risk. *Id*.

- The Transamerica 401(k) Retirement Savings Plan offered a fully benefit-responsive GIC with Transamerica Financial Life Insurance Company ("TFLIC"), an affiliate of the plan sponsor, Transamerica Corporation. The GIC "consists of stable fund segments" with each segment have "a guaranteed rate of interest" like a Synthetic GIC. Auditor's Report, attached to the 2019 Form 5500 for the Transamerica 401(k) Retirement Savings Plan, at page 9. The interest rate is determined quarterly. *Id*., at 10. Like the Prudential SVF, "[t]he Company does not believe that the occurrence of any such events that would limit the Plan's ability to transact at contract value with participants is probable." *Id*., at 11.

- The Valley Children's Hospital Defined Contribution Retirement Plan offered "a fully benefit-responsive investment contract." Auditor's Report, attached to the 2023 Form 5500 for the Valley Children's Hospital Defined Contribution Retirement Plan, at Note 4. "The Plan administrator does not believe that any events that would limit the Plan's ability to transact at contract value with participants are probable of occurring." *Id*.

- The HCC Insurance Holdings Inc. 401(k) Plan offered a fully benefit responsive guaranteed investment contract where the "interest rates are reviewed on a quarterly basis for resetting" and, like the Prudential SVF, "[t]he Plan administrator does not believe that the occurrence of any such event, which would limit the Plan's ability to transact at contract value with participants, is probable." Auditor's Report, attached to the 2019 Form 5500 for the HCC Insurance Holdings Inc. 401(k) Plan, at Note 4. The assets of the HCC insurance GIC are Plan assets, albeit held by MassMutual. *Id*., at Schedule H.

- The American United Life Progress Sharing Plan and Trust offered a "fully benefit-responsive fixed interest investment option with the Company" that "is maintained in the Company's general account" where the rates are "determined quarterly." Auditor's Report, attached to the 2020 Form 5500 for the American United Life Progress Sharing Plan and Trust, at Note 2. The insurance carrier is/was also the plan sponsor. Also, like the Prudential SVF, "[t]he Plan Administrator does not believe the occurrence of any such value event, which would limit the Plan's ability to transact at contract value with participants, is probable." *Id*.

- The Auto-Owners Insurance Company Retirement Savings Plan offered a "a fully benefit-responsive investment contract with Auto-Owners Life Insurance Company (AOLIC), a wholly owned subsidiary of Auto-Owners Insurance Company." Auditor's Report, attached to the 2023 Form 5500 for the Auto-Owners Insurance Company Retirement Savings Plan, at Note 3. Like the Prudential SVF, "[t]he plan administrator does not believe" that any events that "would limit the Plan's ability to transact at contract value" "is probable." *Id.*

- The International Imaging Materials Inc. Retirement and Investment Plan offered a "traditional fully benefit-responsive investment contract." Auditor's Report, attached to the 2022 Form 5500 for the International Imaging Materials Inc. Retirement and Investment Plan, at Note 2. The crediting rates are determined "quarterly" and, like the Prudential SVF, "there are no events that limit the ability of the Plan to transact at contract value with the issuers." *Id.*

- The Mattel, Inc. Personal Investment Plan offered a fully benefit-responsive "traditional GIC" where "the contract itself is owned by the Plan." Auditor's Report, attached to the 2023 Form 5500 for the Mattel, Inc. Personal Investment Plan, at Note 3. "The Plan's administrator does not believe that the occurrence of any such event, which would limit the Plan's ability to transact at contract value with participants, is probable." *Id.*

- The Trugreen Profit Sharing and Retirement Plan offered "a traditional fully benefit-responsive guaranteed investment contract." Auditor's Report, attached to the 2021 Form 5500 for the Trugreen Profit Sharing and Retirement Plan, at Note 4. "The crediting rate is reviewed on a quarterly or semiannual basis for resetting." *Id.* "No events are probable of occurring that might limit the ability of the Plan to transact at contract value." *Id.* Although "MassMutual maintains the contributions in a general account[,]" *id.*, the assets are listed as plan assets. *Id.*, at Note 4, Schedule H.

103. The Prudential SVF in the Plan had underwhelming crediting rates when compared against stable value GICs provided by other comparable carriers for other retirement plans (like the ones mentioned above):

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[15] |
|---|---|---|---|---|---|
| **2019** | Baylor College of Medicine Retirement Plan | 12,587 | $1,278,730,175 | Lincoln Financial Group | 4.29% |

[15] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

| | | | | | |
|---|---|---|---|---|---|
| | Jackson National Life Insurance Company Defined Contribution Plan | 5,002 | $1,090,110,381 | Jackson National Life Insurance | 4.28% |
| | Holzer Health System 401(a) Profit Sharing Plan | 1,896 | $179,609,420 | American United Life Insurance Company | 3.98% |
| | Transamerica 401(k) Retirement Savings Plan | 15,140 | $2,020,965,905 | Transamerica Financial Life Insurance Company | 3.85% |
| | American United Life Progress Sharing Plan and Trust | 3,051 | $377,919,056 | American United Life Insurance Company | 3.70% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,515 | $355,957,124 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | **Philips 401(k) Plan** | **28,428** | **$4,898,009,752** | **Prudential SVF** | **2.76%** |
| | | | | | |
| 2020 | Baylor College of Medicine Retirement Plan | 12,905 | $1,493,377,139 | Lincoln Financial Group | 4.16% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |
| | **Philips 401(k) Plan** | **28,348** | **$5,663,746,665** | **Prudential SVF** | **2.47%** |
| | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 2021 | Gemba Group Annuity Plan | 969 | $118,565,852 | National Ohio Financial Services | 4.97% |
| | Baylor College of Medicine Retirement Plan | 13,391 | $1,692,013,731 | Lincoln Financial Group | 4.23% |
| | Holzer Health System 401(a) Profit Sharing Plan | 2,017 | $203,815,263 | American United Life Insurance Company | 4.02% |
| | American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |
| | Gemba Group Annuity Plan | 969 | $118,565,852 | Principal Life Insurance Company | 3.84% |
| | **Philips 401(k) Plan** | **30,245** | **$6,384,324,582** | **Prudential SVF** | **1.87%** |
| | | | | | |
| 2022 | International Imaging Materials Inc. Retirement and Investment Plan | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |
| | Baylor College of Medicine Retirement Plan | 14,036 | $1,434,738,254 | Lincoln Financial Group | 4.37% |
| | American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |
| | Jackson National Life Insurance Company Defined | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |

| | | | | | |
|---|---|---|---|---|---|
| | Contribution Plan | | | | |
| | Alina 401(k) Retirement Savings Plan | 34,554 | $2,678,277,538 | Brighthouse Life Insurance Company | 3.69% |
| | Trugreen Profit Sharing and Retirement Plan | 11,408 | $371,495,784 | Massachusetts Mutual Life Insurance Company | 3.67% |
| | **Philips 401(k) Plan** | **30,811** | **$5,180,251,859** | **Prudential SVF** | **1.74%** |
| | | | | | |
| 2023 | Valley Hospital Retirement Defined Contribution Plan | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |
| | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |
| | Pomona Valley Hospital Medical Center Retirement Savings Plan | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |
| | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Life Insurance Company | 3.48% |
| | **Philips 401(k) Plan** | **29,489** | **$5,779,286,156** | **Prudential SVF** | **2.78%** |

104. Throughout the Class Period, the Prudential SVF in the Plan underperformed the comparator funds by an average of over 40%, as demonstrated in the table below.

| Year | Prudential SVF Rate of Return in the Plan | Comparator Average Rate of Return | Prudential SVF Percentage of Underperformance in the Plan |
|---|---|---|---|

| | | | |
|---|---|---|---|
| 2019 | 2.76% | 3.94% | 29.95% |
| 2020 | 2.47% | 3.75% | 34.13% |
| 2021 | 1.87% | 4.19% | 55.37% |
| 2022 | 1.74% | 4.06% | 57.14% |
| 2023 | 2.78% | 3.85% | 27.79% |
| Average Underperformance during Class Period | | | 40.88% |

105. Notably, in 2021 the Prudential SVF's crediting rate decreased while the Comparator GIC's crediting rates increased, indicating Defendants' failure to adequately investigate the prevailing marketplace and achieve similar adjustments in the same economy. Subsequent increases were still insufficient to bring the crediting rates in line with the prevailing marketplace and meaningful returns.

106. The dramatic disparities between crediting rates in all years demonstrate that any purported difference in GIC type or theoretical risk cannot be the reason for the Prudential SVF's dismal crediting rate.

107. Again, specific Comparator GICs used herein all had similar risk considerations based on their terms, the creditworthiness of their insurance carriers, and the fact that their plan administrators did not believe it probable that any plan or sponsor event would limit the ability of the Plan to transact at contract value. The Comparator GICs were all fully benefit-responsive and their crediting rates were all regularly reviewed in the same prevailing marketplace and economic circumstances as the Capital Preservation Fund.

108. The Prudential SVF should be achieving at least the same performance of traditional guaranteed investment contracts.

109. In short, because the Plan held between $4.8 billion and $6.3 billion in assets under management throughout the Class Period, it had considerable leverage to bargain for higher crediting rates.

110. A prudent fiduciary would have known that other providers of fixed annuities offer substantially identical, better-performing stable value investments. A prudent fiduciary would have accomplished this goal by demanding higher crediting rates from Prudential/Empower and/or by submitting requests for proposals to Prudential/Empower and other providers of stable value investments.

111. By selecting the Prudential SVF with underperforming crediting rates, Defendants failed to provide participants with an option that maximized the value of their investments.

112. With the massive amount of assets under management in the Prudential SVF, the losses suffered by Plan participants were devastating. Every additional expense imposed upon the participants compounds and reduces the value of their retirement savings over time. *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). For example, a 1% higher fee over 35 years makes a 28% difference in retirement assets at the end of a participant's career.[16]

### C. Defendants Improperly Reduced Philips' Plan Contributions Through Forfeiture Accounts

113. During the Class Period, Defendants breached their ERISA fiduciary duties by misusing the Plan's assets for Philips' benefit and to the detriment of Plan participants.

114. As alleged above, Defendants had a choice on how to utilize forfeited amounts. At the discretion of Defendants in their fiduciary capacity, forfeitures may be used to either pay the Plan's expenses or reduce the Company's contributions to the Plan. *See* 2023 Form 5500 for the Plan, at 8 ("Under the Plan, these [forfeiture] accounts can be used to reduce future Company contributions or pay administrative expenses of the Plan.").

115. Using the forfeitures to reduce Philips' contributions is always in the best interest of Philips because that option would decrease its own contribution costs, which Philips was

[16] Look at 401(k) Plan Fees, UNITED STATES DEPT. OF LABOR at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource center/publications/401k-plan-fees.pdf (accessed Feb. 14, 2025).

required to provide per the terms of the Plan language. Philips is required to provide matching contributions to Plan participants. By using forfeiture amounts to pay employer contributions, Philips gains an advantage because it avoids using its own funds to cover contributions, while plan participants are disadvantaged since they end up bearing the plan's expenses.

116. Absent any risk that Philips would be unable to satisfy its contribution obligations, using forfeitures to pay Plan expenses would be in the participants' best interest because that option would reduce or eliminate amounts otherwise charged to their accounts to cover such expenses.

117. In deciding between using forfeitures to benefit Philips or using forfeitures to benefit the participants, Defendants are presented with a conflict of interest in administering the Plan and managing and disposing of the Plan's assets.

118. Despite the conflict of interest presented by this decision, Defendants failed to undertake any investigation into which option was in the best interest of the Plan's participants and beneficiaries.

119. Defendants did not, for example, investigate whether there was a risk that Philips would be unable to satisfy its contribution obligations if forfeitures were used to pay Plan expenses, or evaluate whether there were sufficient forfeitures to eliminate the Plan's expenses charged to participants and still offset a portion of Philip's own contribution obligations, as a prudent person would have done.

120. Defendants also failed to consult with an independent, non-conflicted decisionmaker to advise them in deciding upon the best course of action for allocating the forfeitures in the Plan, as a prudent person would have done.

121. Although ERISA requires fiduciaries to manage the Plan's assets solely in the interest of participants and although the Plan grants Defendants discretion to use forfeitures to pay Plan expenses, thereby reducing or eliminating the amounts charged to participant accounts to

cover such expenses, Defendants have consistently declined to use the Plan's assets for such purpose during the putative Class Period.

122. Since at least the beginning of the Class Period, Defendants have improperly used forfeited non-vested Plan assets for Philip's benefit to reduce future employer contributions instead of using the funds to benefit Plan participants.

123. According to information from the Plan's Form 5500, the following represents the amount of the forfeitures improperly used to offset Philip's contributions to the Plan, and the amounts used to pay for Plan administration expenses:

| Plan Year | Forfeiture Amounts | Company Contributions | Offset Plan Expenses |
|---|---|---|---|
| 2019 | $1,646,903.00 | $2,739,975.00 | $0 |
| 2020 | $646,785.00 | $2,986,486.00 | $0 |
| 2021 | $830,114.00 | $2,685,841.00 | $0 |
| 2022 | $441,277.00 | $2,565,770.00 | $0 |
| 2023 | $1,351,486.00 | $3,804,454.00 | $0 |
| 2024 | $824,185.00 | $2,736,938.00 | $0 |
| **Total** | **$4,916,565.00** | **$17,519,464** | **$0** |

**COUNT I**
**Breaches of Fiduciary Duty of Prudence**
**(against the Committee)**

124. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

125. At all relevant times, the Committee and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

126. As fiduciaries of the Plan, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan's participants and beneficiaries,

and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

127. The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Prudence Defendants did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan's participants. Instead, the Prudence Defendants selected and retained the Prudential SVF in the Plan despite poor performance in relation to other comparable investments.

128. As a direct and proximate result of the breaches of fiduciary duties alleged herein related to the Prudential SVF, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

129. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

130. The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

**COUNT II**
**Failure to Adequately Monitor Other Fiduciaries**
**(against the Company)**

131. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

132. Philips (the "Monitoring Defendant"), had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee had critical responsibilities as fiduciaries of the Plan.

133. In light of this authority, the Monitoring Defendant had a duty to monitor the Committee to ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

134. The Monitoring Defendant also had a duty to ensure that the members of the Committee possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Company.

135. The Monitoring Defendant breached its fiduciary monitoring duties by, among other things, failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions.

136. As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses. Had the Monitoring Defendant complied with its fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

137. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendant is liable to restore to the Plan all losses caused by its failure to adequately monitor the Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

**COUNT III**
**Breach of Fiduciary Duty of Loyalty**
**(Against the Company)**

138. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

139. At all relevant times, the Company ("Loyalty Defendant") was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

140. As fiduciaries of the Plan, the Loyalty Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).

141. Pursuant to 29 U.S.C. § 1104(a)(1)(A), the Loyalty Defendant was required to discharge its duties to the Plan "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

142. The Loyalty Defendant failed to exercise its duty of loyalty to the Plan and its participants by utilizing forfeited funds in the Plan for the benefit of Philips instead of the sole interest of the Plan participants and beneficiaries.

143. The Loyalty Defendant used these Plan assets for the purpose of reducing Philips's contributions to the Plan, thereby saving Philips millions of dollars each year at the expense of the Plan which received decreased employer contributions, and its participants and beneficiaries were forced to incur avoidable expense deductions to their individual accounts.

144. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars in losses.

145. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Loyalty Defendant is liable to restore to the Plan all losses caused by its breaches of fiduciary duties, and also must restore any

profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

146. The Loyalty Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representatives and designation of Plaintiff's counsel as Class Counsel;

C. A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D. An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E. An order requiring the Company Defendant to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F. Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G. An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I. An award of pre-judgment interest;

J. An award of costs pursuant to 29 U.S.C. § 1132(g);

K. An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L. Such other and further relief as the Court deems equitable and just.

Dated: November 24, 2025

**CAPOZZI ADLER, P.C.**

/s/ Mark K. Gyandoh
Mark K. Gyandoh, Esquire
James A. Maro, Esquire
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
jamesm@capozziadler.com
Tel.: (610) 890-0200
Fax: (717) 232-3080

**Law Offices of Jeffrey Hellman, LLC**
Jeffrey Hellman
BBO # 549896
195 Church Street, 10th Floor
New Haven, CT 06510
Email: jeff@jeffhellmanlaw.com
Tel.: 203-691-8762
Fax: (203) 823-4401
*Counsel for Plaintiffs and the Putative Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 24, 2025, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

By: *Mark K. Gyandoh*

Mark K., Gyandoh, Esq.