IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JAMES HALAMEK, individually and on behalf of all others similarly situated, et al,

Plaintiffs

-VS-

PHILIPS NORTH AMERICA LLC, et al,

Defendants

CA No. 25-12003-FDS
Pages 1 - 26

**MOTION HEARING BY VIDEO**

BEFORE THE HONORABLE F. DENNIS SAYLOR, IV
UNITED STATES SENIOR DISTRICT JUDGE

United States District Court
1 Courthouse Way
Boston, Massachusetts 02210
March 19, 2026, 10:56 a.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA 02210
leemarz47@gmail.com

A P P E A R A N C E S:

FOR THE PLAINTIFFS:

JAMES A. MARO, JR., ESQ. and MARK K. GYANDOH, ESQ., Capozzi Adler, P.C., 312 Old Lancaster Road, Merion Station, Pennsylvania, 19066.

FOR THE DEFENDANTS:

WILLIAM J. DELANY, ESQ., SHAI BRONSHTEIN, ESQ., THEODORE VAN BEEK, ESQ., KELLY A. GELONEK, ESQ., and CAROLINE WOOD, ESQ., Groom Law Group, Chartered, 1701 Pennsylvania Avenue, NW, Suite 1200, Washington, DC, 20006.

ALSO PRESENT: Suzanne Smith, Esq., Senior Counsel, Philips North America LLC.

P R O C E E D I N G

THE CLERK: This is Halamek v. Philips North America, et al, Civil Action 25-12003. Just as a reminder that photographing, recording, or rebroadcasting of this hearing is prohibited and may result in sanctions.

Will counsel please identify themselves for the record starting with plaintiff

MR. GYANDOH: Good morning, your Honor. I'm Mark Gyandoh from Capozzi Adler representing plaintiffs. On the call today, but not arguing, is my colleague, James Maro, also from Capozzi Adler.

THE COURT: All right, good morning.

For the defense?

MR. DELANY: Good morning, your Honor. William Delany on behalf of Philips North America and its Investment Committee from the Groom Law Group. I'll do introductions, your Honor, of the others who are on the video from our side. From the client is Suzanne Smith, Senior Counsel for Philips North America; and also from Groom Law Group is Shai Bronshtein, Kelly Gelonek, Theodore Van Beek, who's here with me, your Honor, and Caroline Wood. And I believe that's everybody.

THE COURT: All right, good morning, all. All right, this is a hearing on defendant's motion to dismiss. We're conducting this by video using the Zoom platform.

Mr. Delany, are you taking the lead here?

MR. DELANY: I am, your Honor.

THE COURT: Okay, go ahead.

MR. DELANY: May it please the Court, your Honor, there are three counts here but effectively two claims. Counts 1 and 2 relate to a challenge to a third-party stable value fund that the plan used during the class period, and then the third count relates to the manner in which the plan used forfeitures within the plan.

If it's okay with the Court, I'm going to just start with -- I'll just go in order of the counts, and I'll start with Counts 1 and 2, which relate to the stable value fund.

Your Honor, the basic allegation is that the stable value fund, which is an investment contract -- it's not a market investment, it's actually an investment contract -- that the interest rate that that contract produced was too low, and the allegation goes that it was too low in comparison to other stable value funds that plaintiff identifies in the complaint.

And the point of the motion, your Honor, is that under this court's controlling precedent and the First Circuit, both the *Ellis* and the *Barchock* decisions, that just alleging that a stable value fund was too conservative or had a lower crediting rate than other funds is not sufficient to state a claim; that attacking a fund for being, you know, quote, "too conservative" is not a valid attack, when the very nature of a stable value

fund is that it is supposed to be an asset-preservation vehicle that is by definition conservative. And that controlling precedent of *Ellis* and *Barchock* should resolve this complaint and warrant dismissal of this complaint out of the gates because this is effectively just a challenge that the interest rate was not sufficient, and thereby was too conservative in comparison to other offerings in the marketplace.

The second layer to the problem here, your Honor, is that the complaint attempts to get by on that claim solely based upon comparators in the marketplace and the interest rates that they produced. It is a requirement that those comparators be meaningful and that the underperformance be sustained and material in order to state a plausible cause of action, and here, this complaint fails on all three of those prongs. And I would direct the Court to the *Lalonde* case, which is from another session in this court, that applied that exact analysis and determined that allegations attacking a stable value fund, just based solely upon the fact that the interest rate produced by that fund was too low, did not state a plausible cause of action.

And here, the complaint breaks down on a number of levels. One, the stable value product here is conservative by design because it is a synthetic guaranteed investment contract, meaning the assets that the stable value contract holds are not maintained in the issuer's, in this case an

insurer, in its general accounts. So it's not subject to the creditors, and it's not on the balance sheet of the insurance issuer, which makes it a much more conservative investment, stable value investment option.

Meanwhile, the comparators are either not identified, or are general account products, or you just can't tell, based upon the allegations of the complaint or what the complaint points to, what they are. And as this court in another session, once again, in *Piercy v. AT&T,* held, in insurance-issued products, the structure of the product matters. And here the structure matters, and there's no dispute that this contract was a more conservative synthetic GIC product.

Plaintiffs will say, "Well, yeah, we agree it's a synthetic GIC product, but it was a synthetic GIC product that was issued by one issuer instead of multiple issuers." That doesn't get them anywhere. It is undisputed, and the contract is before the Court, that this synthetic GIC product holds the actual investments that it relies upon to generate the interest rate by formula in a separate trust. It owns in that trust those investments, and that makes it very, very different than a general account product that is an insurance-issued product that sits on the balance sheet of an insurance company where the plan does not own the underlying investments that generate the return that impacts the crediting rate and is subject to the general creditors of the insurer. And based upon that

feature alone, that important feature, this is a synthetic GIC product and a protected structure, the comparison here breaks down.

But it breaks down for a more fundamental reason than that, and that is that the law, you know, to demonstrate plausible underperformance, it has to be sustained and material. It can't just be episodic. It can't be one year. It has to be sustained. And in this case, plaintiffs' comparators do not -- not a single one spans the entirety of the class period. Most are comparators for only one and sometimes two years. So you've got this rotating cast of comparators that they're comparing the stable value fund to that tells you nothing about what an investable comparison for the period of time that this option was on the platform, what a meaningful comparator would have generated in terms of an interest rate.

And that final point, I would point the Court to an out-of-circuit case but very informative here, same exact complaint, same exact style of rotating cast of comparators, which is the *Clinton v. Baxter* case out of the Northern District of Illinois; and that court rejected this exact complaint for that very reason, which is, you can't demonstrate sustained and material underperformance by having a rotating cast of comparators, most of which are only on the list for one or two years. If the fiduciaries were to be held to that

standard and that were to be accepted, it would require fiduciaries to effectively run around and chase returns or chase a better stable value investment option, and that can't be the law. But particularly in the stable value fund setting where there are penalties, market value adjustments, and other penalties that apply when you exit a stable value contract and disruption, it can't be the requirement that a fiduciary was supposed to run around and chase some available investment option that happened to throw off a couple of, you know, fractions of an interest, of one point of interest over an isolated period of time.

Your Honor, if you have any questions on the stable value aspect of the claim, I'm happy to address it.

THE COURT: I'm paraphrasing here, but what about the allegations that there is a fiduciary duty to -- I forget how it's framed, but basically ongoing evaluation of things like not just rate of return but risk and, you know, everything that goes into it, that you can't just make this investment and then walk away and assume everything is going to be all right, right? You have to keep reviewing it. And I assume that part of that review would include whatever penalties or fees would be incurred if you withdrew. But what about, and I'm paraphrasing the argument, but what's your response to that?

MR. DELANY: So, your Honor, it's both -- effectively plaintiffs have brought a selection and a monitoring claim.

The breakdowns of what I identified, which is, number one, a disconnect in the meaningfulness of the comparators and the rotating cast of comparators throughout the period, infects both the selection and the monitoring. It does not demonstrate any point in time where a monitoring fiduciary should have removed the stable value fund because the interest rate was, quote, "too low." That runs directly into *Ellis* and *Barchock*, which is requiring a fiduciary to jettison a conservative stable value product that's designed to protect the invested capital asset preservation, requiring them to leave a safe product like this one, which is a synthetic GIC where the assets are protected in a separate trust and not exposed to the insurance company's general risk like most of the other comparators. The analysis is the same at selection, and it's the same at monitoring, and the plaintiffs' problems are the same as well.

THE COURT: And how do I resolve that on 12(b)(6) as opposed to summary judgment? In other words, I have to take all of the plausible allegations of the complaint as being correct.

MR. DELANY: Your Honor, two responses to that. The stable value funds, which are investment contracts -- they're not actual investments themselves -- are viewed differently by the courts, and specifically the First Circuit in *Ellis* and *Barchock.* And *Barchock*, your Honor, is a motion-to-dismiss

decision, and there the court held that merely saying that something was too conservative or that the interest rate was too low because it was too conservative is not enough and granted dismissal. And that's out of the First Circuit.

And then I would point your Honor to *Lalonde*, which is a District Court holding in I believe 2024 which applied the exact analysis that I just articulated on a motion to dismiss, which is to look at whether or not the proposed comparisons are meaningful, and whether or not, if they were meaningful, there was sustained and material underperformance or difference in the crediting rate. And here, just in terms of being sustained, switching out the comparators year over year, which is right on the face of the complaint, is not sufficient. It just -- it just doesn't cut it. And that is right on -- it's right on the face of the complaint.

So for those two reasons, I think both *Ellis* and *Barchock* give the Court comfort that it is appropriate to dismiss on the papers a stable value fund case like this where the allegation is just that you didn't earn enough interest, it was too conservative and you didn't earn enough. And *Lalonde* I think gives this Court the footing to dismiss based upon the meaningful comparator and not demonstrating on the face of the complaint sustained and material underperformance.

THE COURT: All right.

MR. DELANY: So, your Honor, next I would like to

address the issue of forfeitures. Your Honor, I'm happy to talk about forfeitures and what they are if the Court would find that to be beneficial, but I --

THE COURT: I think I understand what they are.

MR. DELANY: Okay, yeah, and I don't want to bore you.

THE COURT: Well, that's the standard -- well, I guess I'll pause there, but go ahead.

MR. DELANY: Effectively, there are certain things that are agreed upon here. One is that there were forfeitures in the plan, meaning people who were not yet vested but had company contributions designated to their accounts left, and therefore those company contributions did not vest in the plan, and the money returns to the plan, and the question is, you know, what happens to that money when those contributions are back in the plan and they're no longer attributed to those employees' accounts?

Here, the complaint alleges that the fiduciary had the discretion as to what it would do with those assets, and that discretion included using them to defray future contributions or using them to defray plan expenses. And plaintiffs' allegation effectively is that the company was required to use the forfeiture assets to defray expenses, and our position is that that is just not legally correct. There is no basis for that contention. This claim here, unlike some other claims in other courts, is just a duty-of-loyalty claim, which makes it,

I think, your Honor, more straightforward a motion to dismiss and more susceptible to attack on a motion to dismiss.

And what's not disputed here is that it's perfectly lawful. It's been recognized for close to 30 years. And certain regulations, certain government pronouncements, and a recent DOL amicus brief at the appellate level on this issue, that it's perfectly appropriate to use forfeitures to defray company contributions. I don't think there can be a dispute about that.

And plaintiff will say, "Well, we're not making a per se allegation that using forfeitures to defray company contributions, we're not saying that's a per se violation," but that's effectively what this complaint says because what their theory is, is that a company is required to use -- a company that has discretion is required, or a fiduciary that has discretion, is required to use forfeitures to defray plan expenses first, and then use it for contributions, and there's no basis for that requirement.

THE COURT: I don't think that's quite what they're saying -- I may have it wrong -- but I thought that the thing that they were -- or what the complaint alleges, I think, and you can correct me, is while the plan permitted either -- that is, to offset employer contributions or to, you know, defray administrative expenses of the plan -- a hundred percent of the time it benefited the corporation. And while the defendants

had the authority to do that, I think the sense that I got from the complaint is, if you're doing it automatically, you're not assessing what is best for the beneficiaries. You have a fiduciary duty, right? Is this the option that most favors, is most beneficial to the beneficiaries of the plan? And you're just automatically, you're giving it back to the company, that that itself violates a duty of loyalty. Your phrasing. I'm sure that plaintiffs' counsel is going to phrase that better, but I think that was the thrust of it.

MR. DELANY: I appreciate that correction, your Honor, and some of what you have just identified would go to a prudence claim, which is not in this complaint, which is the process by which a determination was made. But whether all of the forfeitures were used for contribution or not, from a loyalty perspective really doesn't matter. The point is that using forfeitures to defray company contributions is perfectly lawful. There is no requirement to maximize an employee's benefit --

THE COURT: I know, but, again, I'm not sure that's quite the point. The point is, the plan gives them discretion, okay? And it's lawful. And they could, you know, a hundred percent of the time use their discretion in this way. But, again, the plausible allegations of the complaint, which is, again, it's not summary judgment here, the plausible allegations of the complaint seem to me to say, well, you have

this -- you can exercise this discretion in one of two ways, and a hundred percent of the time you'd do it to benefit the company and without any assessment of, was this necessary or not? You know, they say, well, Philips wasn't on the brink of insolvency, there wasn't anything like that, they're not threatening the future viability of the plan, and they didn't undertake that review or investigation, or, you know, however it's framed. And, again, on a motion to dismiss, I have to take all of that, if it's plausible, as accurate, right? So --

MR. DELANY: Well, your Honor, if you may allow me, I would like to recalibrate the Court's thinking on that issue, which is, it's not disputed that the assets that were forfeited remained in the plan, are plan assets, and were used to pay future plan benefits, and that all of the conduct was lawful. And one of the permitted purposes under the plan was to defray future company contributions, which is the provision of a benefit within the plan.

THE COURT: I understand that again, but why? Why was it always that choice and not the other a hundred percent?

MR. DELANY: Your Honor, I would submit, on a loyalty claim, that the plaintiff doesn't answer the question of why, the complaint does not answer the question of why, and all you're left with in this complaint on a loyalty claim is an incidental benefit to an employer, which is not enough to sustain a breach of duty of loyalty claim, even at a motion to

dismiss.

THE COURT: Because the plan permits it?

MR. DELANY: The plan permits it. The law permits it. The money never leaves the plan, and the money is used, the assets are used to pay plan benefits.

And another important point is that there is no obligation to -- the plaintiffs' positioning starts from the proposition that there is some obligation to maximize additional benefits to participants, and that does not exist. The participants here received all of the benefits they're entitled to, and the assets were used to pay those benefits, including the contributions to pay those benefits. And that is the critical distinction that the overwhelming majority of courts that have dismissed these claims on a loyalty basis have pointed to as the basis of dismissal.

And, your Honor, too, the Department of Labor in amicus briefs submitted before the Ninth Circuit and the Third Circuit agree with our view. And the longstanding history agree -- you know, that legislatures have interacted with ERISA over the years has acknowledged that it's perfectly appropriate. And so, you know, again, all you have is no indicator in this complaint of a self-infected motive and incidental benefit, which are not enough at the motion to dismiss to sustain a loyalty claim.

THE COURT: Okay.

MR. DELANY: Your Honor, I'll yield if you have no further questions.

THE COURT: No. Go ahead, Mr. -- am I pronouncing this right, Gyandoh?

MR. GYANDOH: Your Honor, it's "John Doe" like the unidentified --

THE COURT: Okay.

MR. GYANDOH: But it's close. Thank you, your Honor. So I'll address the arguments Mr. Delany made in the order in which he made them.

So with regard to the stable value fund claim, Mr. Delany started off saying that our claim is that we say the Prudential fund was too conservative, and it puts it within the sort of crosshairs of the *Ellis* and *Barchock* case. That couldn't be further from the reality.

The claim in this case is not that the Prudential fund was too conservative. It is what it is, and what it is is a fund meant to preserve assets. And what we do is, we look at the other funds just like it that are meant to preserve assets but which yield a higher crediting rate. And the question we ask is, if you are a fiduciary whose job it is to look out for the sole interest of the participants, why is it that your stable value fund, which is in all material respects the same as other stable value funds, have such a low crediting rate?

There are a few things we point out in this case which

I think factually show the plausibility of our allegations. The first is that this product itself, the stable value fund, according to its own prospectus, the rates reset every six months. And I think, as your Honor noted when Mr. Delany was arguing, if it resets every six months, the fiduciaries have the responsibility to continue to monitor the fund. Thus, if every six months if they're looking on the marketplace and there is another stable value fund, many of which we pointed out that have higher crediting rates, that's one condition to look at. So, again, that goes to plausibility of our allegations.

The other aspect of this Prudential fund that the two parties have quibbled with is whether it's a synthetic GIC or whether it was a general account GIC and what that means. Again, all that does is tell us that this is a discovery matter, but, nonetheless, here's what we do know: The prospectus says this is supposedly a separate account GIC with one wrapper, and the one wrap is Prudential. Well, in our complaint, your Honor, we point out that Prudential itself has some attributes to it that make it more risky than other providers. And, you know, there's a section of our complaint which discusses the surplus to liabilities and the ratio we mention, and that we allege that the surplus to liabilities ratio of Prudential is low, and suggest that it's a higher risk of default of other funds.

Mr. Delany pointed out in his motion to dismiss that we don't connect the various allegations with the allegations that the Prudential fund is included. Well, here's the connection: If you have a separate account -- and we may quibble, disagree on whether it actually is a separate account -- and you have one wrapper by one company that we say is more prone to default than other companies, what good is that one wrapper? So, again, it goes to the fiduciary's process, whether they actually evaluated the nature of Prudential and whether it was a good fund to have in the plan. Again, these are factual issues that I think will need to be divulged in discovery, but we pled them.

So to sum up our response to the first point, we're not arguing that this fund is too conservative. We're saying it is what it is: It's a stable value fund that preserves funds. In the *Brotherston* case that went up to the First Circuit, the First Circuit said something to the effect that -- I want to make sure I get this right -- "A trustee who decides to stuff cash in a mattress cannot be sure that there is no loss merely by holding onto the mattress." So they're all conservative, but there are other funds out there that have higher crediting rates.

The second point Mr. Delany argued about was the nature of the comparators. Again, there is numerous decisions from the First Circuit across the country that say, when you

get into whether a comparator is meaningful or not meaningful, you're really getting into more factual issues where there's dispute of facts. But here I think we've put enough out there, enough nuggets to show a plausible claim that our comparators are true comparators.

First, we explain that these stable value funds all do the same thing: They preserve wealth, assets. We compare it to other funds that do the same thing. You know, defendants, again, quibble with what we have taken from prospectuses to say they're not meaningful enough. We say that all these funds are benefit-responsive. They all -- they all have to be -- rates have to be reset periodically. And these are important aspects that a fiduciary should take into consideration when considering which stable value fund to select for the plan because, again, at bottom here, we're looking at taking and making decisions in the sole interest of plan participants. That's what we have to keep in mind.

As far as whether our comparators are meaningful, additionally, Mr. Delany makes a lot of the fact that we only point to only several -- only a few of our -- none of our funds are consistent -- are consistently in the same plans throughout. But the reasoning is, we have several funds, five funds that have more than one year of credit related to the same plan, two that have more than two years. But the whole point of showing the different crediting rates of the different

funds is that the Prudential stable value fund resets its own rate every six months. So if you go on the market, our chart basically gives you a snapshot each year of the different types of funds you could select. And we're at the motion to dismiss stage. This is plausibility: Is it plausible that there are other funds that have higher crediting rates? Yes, and that's what we show. But, again, I think it comes down -- these are -- when talking about comparators, I think the courts have decided that these are issues to be decided after the pleadings for the court to have the better of the arguments.

The third point Mr. Delany made was that there wasn't a sustained or substantial underperformance. Well, again, this still goes to the issue of the comparators. I don't know there's really any set time limit that a fund has to be underperformed before a court says the fiduciaries have breached their fiduciary duty. What we have shown here is that over the course of the class period, the fund did underperform compared to other stable value funds. This is a six-year class period. We show four years of it because of the data we have, but presumably the underperformance is still continuing. I think on a motion to dismiss, the plausibility is that -- we've shown the plausibility by showing the consistent under-performance compared to other funds. And, again, I think what's important here is looking at the attribute of the Prudential fund, that they reset their own rates every six

months.

Mr. Delany pointed to the *Clinton* and *Baxter* case, which I would acknowledge that that is -- that is -- the court -- the court in that case did show concern about the nature of the -- of not having a consistent response for the entirety of the class period. Again, I say I don't think it is necessary. However, the plaintiffs, which, with all due candor, my firm represented the plaintiffs in that case, there was an amended complaint that was filed that addressed that issue with that court. But the point is, in *Baxter*, what we should take from *Baxter* is that in that case, the judge did agree that all the other aspects of the comparisons made sense. So to the extent there's any wisdom to take out of *Baxter*, it is that our -- our admissions are plausible.

THE COURT: Tell me or summarize, if you would, on how this aspect of the case is different from the First Circuit's opinion in *Barchock*? In other words, what is it that distinguishes this from *Barchock*?

MR. GYANDOH: Of course. So in *Barchock*, the plaintiffs were actually taking issue with how the fund was actually composed, in terms of what was comprised of it and how it ended up performing. We're not -- here we're not disputing -- we don't -- we're not disputing how it's comprised. We've seen that composition is similar to all the other funds we're comparing it to. We're not taking issue with

the fact it's a stable value fund, whereas in *Barchock,* it was taking issue with the type of fund it was. Here, we're saying it doesn't matter, the other funds like this fund that you could have (Unintelligible). That is a big difference between this and *Barchock*.

THE COURT: Okay.

MR. GYANDOH: So those were three the points I believe Mr. Delany made with regards to the stable value fund, and obviously you have to get some arguments within those three main points.

With regard to the forfeiture argument, I think your Honor said it more eloquently than I could. I know you said I may phrase it better, but here's the point of the forfeiture case: It's a loyalty claim, and there's a motion to dismiss, so we have to -- we're not in the heads of the fiduciaries. We don't have meeting minutes. We don't know what they're saying in those minutes. What we do have is what they did, and we know that there is millions of dollars they used to pay for -- to help themselves to contribute, to make massive contributions; whereas, they used zero dollars that could have helped the other participants to save money. If they had used any of that amount of money to defray plan expenses, it would mean those plan participants who paid those expenses would have paid less expenses. So there is certainly a concrete loss to those ten participants; and those decisions, zero compared to millions of

dollars, I think there's a plausible claim here that these fiduciaries were being disloyal because no action -- none of the actions they took was in the sole interest of the plan participants, and that has to be the sort of marker. And, you know, we've submitted the *ITW* and *Tool Works* decision as supplemental authority, and we also cited to the *Trader Joe's* case in the District of Massachusetts -- that's one of Judge Young's cases -- where the plaintiffs in those cases brought loyalty claims, not Prudential claims, loyalty claims that defendants breached their duty of loyalty by putting zero dollars toward plan expenses and using all the forfeitures or the majority of the forfeitures to benefit themselves -- that is, the company's -- by defraying their own contributions to the plan.

THE COURT: All right.

MR. GYANDOH: With that, your Honor, I believe those are the main points Mr. Delany made. I believe we do address all these in our opposition brief, and I think our complaint addresses all of these issues, but if there's something I missed that you want me to clarify, I'm happy to do that now, your Honor.

THE COURT: Mr. Delany, any very quick response?

MR. DELANY: Very quickly, your Honor, and I'll just focus on the stable value fund aspect of the case. What's clear under the -- this case is worse than *Barchock*, to put it

bluntly. In *Barchock*, the plaintiff at least attempted to attack the underlying holdings of the stable value fund product that resulted in the rates of interest that it provided to participants. And the court in *Barchock* said that's not enough, you're just attacking how conservative the fund is; and in a conservative investment option that's designed to preserve capital, that doesn't cut it.

Here it's one degree worse than that, which is, the plan doesn't even address the underlying holdings of the stable value contract here. It doesn't deal with how they're structured and insulated from the insurer because they're synthetic and held in a separate account and a separate trust, and therefore they're more conservative, and that results in a different rate.

And this court in the *AT&T* case, *Piercy v. AT&T*, another session, your Honor, has held that in insurance-issued products like this, the structure matters, and it matters at a motion to dismiss. And here there is no dispute as to the way this product is structured, and this is just an attack on the fact that that structure is more conservative than the funds that the plaintiff points to.

The other thing I wanted to point out very quickly, your Honor, is this notion of rate resetting. All of these stable value funds reset their rate, some quarterly, some half a year, some yearly. It doesn't matter. The notion that

Philips' committee was supposed to, A, know, and, B, go out and find, you know, what the Baylor College of Medicine was able to secure in its stable value contract for the year 2020, and then go and chase that stable value contract because it has a couple fractions of a percentage point of a better interest rate, is fanciful. It just -- it is an utter unworkable standard to apply to fiduciaries. And when the complaint on its face has a rotating cast of characters and does not provide the Court an anchor on which to say that there's sustained and material underperformance in comparison to a meaningful benchmark sufficient to move this from a possible fiduciary breach to a plausible fiduciary breach, the complaint fails under the clear precedent of this court. This complaint clearly meets that standard and should be dismissed, and dismissed with prejudice, your Honor, because this is the second amended complaint. These arguments were raised. This is an amended complaint. These arguments were raised as to the first complaint the plaintiff has filed, and the amended complaint doubled down, did not fix these problems, both on the stable value claim side and the forfeiture side, and therefore the dismissal should be with prejudice.

Thank you, your Honor.

THE COURT: All right, Mr. Gyandoh, any response to that?

MR. GYANDOH: Just to the last point with regard to

amendment. We respectfully request that if your Honor were inclined to dismiss the case, we'd ask to be given opportunity to amend the complaint to address whatever deficiencies your Honor sees in the complaint.

THE COURT: All right, thank you. I will take this under advisement. Thank you.

MR. GYANDOH: Thank you, your Honor.

MR. DELANY: Thank you.

(Adjourned, 11:39 a.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS ) ss.
CITY OF BOSTON )

I, Lee A. Marzilli, Official Federal Court Reporter, do hereby certify that the foregoing transcript, Pages 1 through 26 inclusive, was recorded by me stenographically at the time and place aforesaid in CA No. 25-12003-FDS, James Halamek, et al v. John Does 1-10, et al, and thereafter by me reduced to typewriting and is a true and accurate record of the proceedings.

Dated this 23rd day of March, 2026.

/s/ Lee A. Marzilli

LEE A. MARZILLI, CRR
OFFICIAL COURT REPORTER